No. 2890.

AUGUSTUS BOHN *v.* CAPTAIN CLEAVER AND LINDSEY, Master and Owner of British steamship Robert Lowe.

If it be conceded that a contract was violated willfully, or through carelessness, still the measure of damages would be the injury inflicted upon the plaintiff, where there is no *penal* clause in the contract.

Damages arising from the presumable profits of a speculation that was never made, are too uncertain for a court of justice to award.

APPEAL from the Sixth District Court, parish of Orleans. *Cooley, J. Howe & Prentiss, Randolph, Singleton & Browne,* for defendants and appellants. *D. C. Labatt,* for plaintiff and appellee.

LUDELING, C. J. This suit is for damages for the violation of a contract of affreightment. The conclusion we have come to. on the question of damages, after a careful examination of the evidence, renders it unnecessary for us to decide any other question discussed by counsel. If it be conceded that the contract was violated willfully, or through carelessness, still the measure of damages would be the injury inflicted upon the plaintiff, for there is no penal clause in the contract. It is as follows:

" August Bohn, Esq. :

" We offer you the British auxiliary steamship Robert Lowe, about twelve hundred and seventy-seven tons register, for a full cargo of cotton, privilege Liverpool or Havre, at three-quarters pence three farthings for the former, or seven-eighths pence latter, with five per cent. primage, invoice weight, steamer free of commissions, here or in Liverpool or Havre; thirty days to be allowed for loading at the port, and steamship to be ready to receive cargo not later than the fifteenth of October. "HUNTER & CO.

" Accepted.

" P. p. AUG. BOHN.

" R. W. SIMPSON."

It appears that the Robert Lowe arrived at the bar at the mouth of the Mississippi river on the thirtieth September, but she did not reach New Orleans until about the twentieth of October, four or five days

after the time when she should have ·been there, in accordance with the terms of the contract. Freights declined from the fifteenth of October, 1869, steadily, until the end of November. So far as shipping the plaintiff's own cotton was concerned, this was a gain to him, and not a loss. So far as sub-letting the ship to other shippers was concerned, he did not make any such contract. He testified that he did not like to take the risk of making contracts, because he was apprehensive that the vessel would not be here in time. And for these speculations, which he thinks he might have made, but which he did not dare to make, he wishes the defendants to pay him $16,000.

Damages arising from the presumable profits of a speculation that was never made are too uncertain for a court of justice to award.

The evidence shows that the Robert Lowe was at the bar on the thirtiéth of September; that efforts were being made to get her over the bar, that these facts were known to the plaintiff; and that the Lowe actually reached the city only a few days after the time she was to be ready to load. It is further proved that she could have discharged her cargo and received her load in ten or twelve days. We are at a loss to see how the plaintiff has been injured. But he stands upon his bond, and demands his pound of flesh. We award him everything that is in the bond, but nothing that is not therein written.

It is therefore ordered and adjudged that the judgment of the lower court be avoided and reversed, and that there be judgment in favor of the defendants, rejecting the plaintiff's demand, with costs of both courts.

———

TALIAFERRO, J., *dissenting*. I think judgment should be rendered for plaintiff. This suit is brought on a charter party, drawn up as follows:

"Office of William Creevy, broker, steamship agent and commission merchant, 33 Carondelet street, New Orleans, September 25, 1869.
"Augustus Bohn, Esq.:

"Dear Sir—We offer you the British auxiliary steamship Robert Lowe, about 1277 tons register, for a full cargo of cotton, privilege Liverpool or Havre, at three-fourths pence three farthings for the former or seven-eighths pence latter, with five per cent. primage, invoice weight; steamer free of commission here or in Liverpool or Havre; thirty days to be allowed for loading at this port, and the steamer to be ready to receive cargo not later than the fifteenth day of October.

(Signed)                              "HUNTER & CO.
"Accepted: AUG. BOHN.
(Signed)        "P. p. R. W. SIMPSON.
"Witness: (Signed) OLIVER P. REZEAN."
Internal revenue stamp $10 affixed.

Bohn v. Cleaver and Lindsey, Master and Owner of British steamship Robert Lowe.

The plaintiff alleges that the defendants failed to have the steamer ready in port to receive cargo on the fifteenth of October, according to their contract, and in consequence thereof he has suffered damages to the extent of $16,049 37, which he alleges arise from the loss to him from being unable to load the ship at the stipulated time, when freights on cotton were ruling high in New Orleans, there being offered for Liverpool one penny and one-eighth sterling per pound, and none obtained; that that price was paid at that time for freight to Havre. He alleges that the difference between the rate agreed upon by the charter party and the prevailing rates in New Orleans on the fifteenth of October was three-eighths penny sterling per pound, which at the rate of exchange makes the sum claimed as damages.

The defendants deny that plaintiff has suffered loss from the unavoidable failure on their part to have the ship in the port of New Orleans on the fifteenth of October, which failure occurred from the low stage of water that rendered it impossible for the vessel to pass over the bar at the mouth of the Mississippi, and they plead *vis major*. They further allege that the steamship did reach the port of New Orleans and was ready to receive cargo on the twentieth of October, of which they gave plaintiff notice, but that he refused to accept and load her; that defendants had previously, on finding it impossible to get the ship in port by the fifteenth of October, offered to pay all extra expenses incurred in keeping the cotton until it could be received on the vessel, and guaranteed that the vessel would load and be ready to sail within the thirty days allowed for loading.

There was judgment in the court below in favor of the plaintiff for $8024 67, with interest at five per cent. from judicial demand.

The defendants have appealed.

The defendants' counsel holds that the contract between the parties is a Louisiana contract; that it was made in Louisiana; was to be performed in Louisiana as to all matters at issue, and that both the jurisprudence and the statutes agree in laying down the rule that such a contract is controlled in every respect by the laws of Louisiana. The contract was entered into in Louisiana, but it seems its accomplishment was to take place in a foreign country. The undertaking of the owners of the vessel was to bring her to New Orleans by the fifteenth of October, to be loaded with cotton by the plaintiff, and she was thence to proceed to the port of delivery (Liverpool or Havre at the option of the shipper), the owners to be paid for their services at a fixed price per pound for the freight of the cotton. The inception of the contract took place in New Orleans, but the parties looked to its fulfillment in Europe, where the delivery of the cargo was to take place.

" An instrument as to its form and the formalities attending its exe-

cution must be tested by the laws of the place where it is made ; but the laws and usages of the place where the obligation of which.it is the evidence, is to be fulfilled, must regulate the performance." 11 Martin 25, 8 N. S. 34, Civil Code, article 10, 2 An. 774.

The commercial and maritime law should therefore govern as to the fulfillment of this contract of affreightment.

The plea of *vis major*, or overpowering force, alleged by defendants as releasing them from the performance of the obligation they entered into to have the vessel ready in the port of New Orleans on the fifteenth of October, to receive cargo, I think should not avail them. That the impediment of the bar at the mouth of the river and the low stage of water at the time, did not present an obstacle absolutely impossible to be overcome by defendants, seems apparent from the fact that on the nineteenth or twentieth of the month they did surmount the obstacle by resorting to lighterage and the additional motive power of several steam tugs. By this means the vessel was taken over the bar and she came at once into port. It is in proof that the Robert Lowe arrived at the bar on the thirtieth of September, and there remained until after the fifteenth of October, the day she was to be at New Orleans to receive cargo. During all this time no attempt was made to put in requisition the appliances by which she finally came over the bar and reached the city. The difficulties in the way of entering the Mississippi arising from that *opprobrium scientiae*, the bar lying at its entrance into the gulf, are well known, and the defendants in their contract made no exception on account of those difficulties. They obligated themselves unconditionally to bring their steamer to New Orleans and be ready to receive cargo not later than the fifteenth of October. The untoward state of things which they found on arriving at the mouth of the river forms no ground for relief against their absolute and unqualified undertaking that their vessel should arrive at New Orleans at the time fixed. The rule is one of common acceptation that in general a charter party operates as a contract of insurance as well as of affreightment where no exception is introduced.

In the case of the Harriman, 9 Wallace, p. 172, the facts were, that a vessel was chartered in San Francisco to carry coal to the Spanish fleet, supposed to be then operating against Valparaiso; and the chartered vessel sailed from San Francisco on May 22, and it turned out that two days afterward the Spanish fleet left the coast of Chili and went to parts unknown, and did not return there. The chartered ship proceeded to the Chinca Islands, where it was ascertained that all was quiet at Valparaiso, and that nothing was known of the Spanish fleet. The ship returned to San Francisco, without going beyond the Chinca Islands. The Supreme Court of the United States, in regard to the main issue in that case, said: "The owner made no provision against

any contingency. His engagement was simple, direct, and uncondi-
tional, that the vessel should proceed to Valparaiso. The presence or
absence of the consignee was immaterial. If absent, it was the right
and duty of the master to place the cargo in store. The contract was
not fulfilled. For this the shipper is in no wise responsible. Such are
the relations of the parties. The contract of affreightment is governed
by the same principles as other special contracts. There are none to
which these principles are more stringently applied. The contract is
an entirety; and where there has been no complete fulfillment on one
side and no fault or waiver on the other, no freight money can be
recovered. Mr. Justice Story says this is the result of all the cases."
The court further said: " The principle deducible from the authori-
ties is, that if what is agreed to be done is possible and lawful, it must
be done. Difficulty or impossibility of accomplishing the undertaking
will not avail the defendant. It must be shown that the thing can not
by any means be effected. Nothing short of this will excuse non-per-
formance. The answer to the objection of hardship is, that it might
have been guarded against by a proper stipulation. It is the province
of courts to enforce contracts, not to make or modify them. When
there is neither fraud, accident, nor mistake, the exercise of dispensing
power is not a judicial function."

I think the plaintiff has made out clearly a loss to the amount of the
sum awarded him by the judgment of the lower court. The defendants
had chartered their ship to carry cotton to Liverpool for seven-eighths
pence per pound. The plaintiff had the right on paying that rate to
load the ship at a higher rate if he could get it. Early in October,
Decan & Zerega, ship brokers, offered to the plaintiff for the Lowe
two thousand bales at fifteen-sixteenths pence per pound, which he
declined, under the apprehension that the Lowe would not arrive on
the fifteenth. The plaintiff, about the same time he was offered the
two thousand bales by Decan & Zerega, endeavored through those
brokers to ship a thousand bales of his own cotton on the Alhambra at
two cents per pound, but could not effect the shipment because the
Alhambra was loading at two and a-half cents per pound. I am
satisfied that the evidence is conclusive that the Lowe could have been
readily loaded at fifteen-sixteenths pence per pound had she been in
port at the stipulated time.

It is shown that freights just at that time were ruling high, even a
penny or more, it seems, had been offered in some instances. When
the plaintiff offered a thousand bales to the Alhambra, she was the
only steamship in port. The number of bales the Lowe was capable
of carrying is shown, and I think the estimate made by the court a
qua of the difference between the contract price by the charter party
and what is assumed as the average rate of freights on the fifteenth of

October, viz., a penny and one-sixteenth, correct. To this is added five per cent. primage, the whole reduced to United States currency at the rate of exchange at New Orleans on England on the fifteenth of October, 1869, making $8024 67. For this sum, with five per cent. interest from judicial demand, the judgment was rendered, and, I think, correctly.

MORGAN, J. I concur with Mr. Justice Taliaferro in his dissenting opinion.

Rehearing refused.